**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gary Cawley, et al., | No.  CV-22-00823-PHX-SPL |
| Plaintiffs, | |
| vs. | **ORDER** |
| American Financial Security Life Insurance Company, et al., | |
| Defendants. | |

Before the Court is Defendant American Financial Security Life Insurance Company's ("American Financial's") Motion for Summary Judgment (Doc. 123), as well as Defendant International Benefits Administrators' ("IBA's") Motion for Summary Judgment (Doc. 121).[1] The Court now rules as follows.

## I.    **BACKGROUND**

This case arises out of an insurance coverage dispute between Plaintiffs, Mr. Gary Cawley and Mrs. Pamela Cawley ("Plaintiffs" or "the Cawleys"), and their former insurer, American Financial. (Doc. 1-4 at 2–3). In 2018, Mrs. Cawley researched health insurance policies for herself and her husband because COBRA coverage through Mr. Cawley's former employer was cost prohibitive. (*Id.* at 3; Doc. 124 ¶ 6). They were seeking health insurance primarily to cover any traumatic events or catastrophes because their family,

---

[1] Because it would not assist in resolution of the instant issues, the Court finds the pending motion is suitable for decision without oral argument. *See* LRCiv. 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

including their son, were all healthy with no significant pre-existing conditions. (Doc. 124 ¶ 7; Doc. 141 ¶ 7). On November 28, 2018, Mrs. Cawley spoke to an insurance agent named Sharisa Vaval ("Vaval"), an employee of non-party GoHealth, LLC ("GoHealth"), who opened the call by stating, "Thank you for calling GoHealth. My name is Sharisa. I'm a licensed agent." (Doc. 124 ¶ 8; Doc. 142-4 at 3). After speaking with Vaval, Mrs. Cawley ended up purchasing a short-term medical policy ("STMP") from American Financial with a renewable six-month term. (Doc. 124 ¶ 16; Doc. 141 ¶ 16–17).

In describing the plan to Mrs. Cawley, Vaval stated, in pertinent part,

> So with this plan, it's called AdventHealth[2] through LifeShield. It's is [sic] short-term plan. And how this plan works, for your doctor visits, it's a $25 copay. Your coverage maximum per person is $1 million. Your max out-of-pocket is 2000. This is an 80/20 plan. The deductible is 10,000 . . . . Also, let me just describe some of the benefits. So the benefits of this plan, you'll get your preventative and your wellness care. You'll get your inpatient prescription drugs, physical, occupational and speech therapists, emergency transportation, inpatient room and board, home health care, extended care. This plan will be for six months. You have up to a 36-month renewal with a preexisting condition waiver.

(*Id.* ¶ 13; Doc. 124-1 at 34). Later on, Vaval noted that if the Cawley' STMP application was denied, the Cawleys would have to purchase a "major medical plan," which Vaval described as "cover[ing] all your preexisting conditions and mental health, and it's for the whole year." (Doc. 124-1 at 47). Vaval remarked that "these major medical plans are so expensive. Like, the lowest plan I'm looking at in your area is, like, $1,500," to which Mrs. Cawley replied, "Right. Yeah, we've looked into those already and we're trying to find something different." (*Id.*). By contrast, Vaval told Mrs. Cawley that the initial payment for the AdvantHealth STMP would be $345.47, with subsequent monthly payments of $324.37. (Doc. 140 at 5). Mrs. Cawley believed that the premium was much lower because of "the high deductible and the short term aspect." (*Id.*). At no point did Vaval explain that

---

[2] The parties use two different spellings, "AdventHealth" and "AdvantHealth," in their briefings. For consistency, this Court will refer to the relevant plan as "AdvantHealth," as it appears in various exhibits (*see, e.g.*, Doc. 142-6).

the AdvantHealth policy had per-day and per-event caps on coverage that severely limited benefits compared to a more comprehensive, traditional "major medical plan." (*Id.* at 5–6). In fact, when Mrs. Cawley specifically asked whether the plan "covers doctors' visits and hospitalization and all that stuff?" Vaval simply answered, "Yes." (Doc. 142-4 at 9). Mrs. Cawley did not think she was getting an ACA-compliant, "full coverage" policy that would include maternity care, preventative care, and dental or vision; nor did she expect coverage for any pre-existing conditions, which her family did not have at the time; rather, it was her expectation that the STMP would provide "up to a million dollars of coverage for catastrophic illness or accident." (Doc. 142-3 ¶¶ 30–31).

Mrs. Cawley completed an enrollment application while still on the phone with Vaval. (Doc. 140 at 6). According to American Financial, after an agent (like Vaval) finds a plan for a consumer, the consumer is typically "transferred to another representative who will go over the plan documents . . . to ensure that the consumer understands the plan and wants to purchase it." (Doc. 141 ¶ 73). However, no such transfer occurred in this case. (*Id.*). Based on the recording of the conversation, it took Mrs. Cawley only 52 seconds to sign 17 documents. (Doc. 142-3 ¶ 42). As part of the enrollment application, Mrs. Cawley signed and attested that she read, agreed to, and accepted numerous statements regarding the policy; however, by her own admission, she did not read through every page of the application as she was signing and probably only ever "scanned" the document afterward. (Doc. 124 ¶ 17; Doc. 142-2 at 18). Among the signed attestations, she agreed that she understood that "short term medical insurance is not considered 'minimum essential coverage' under the affordable care act," and that it is merely "intended for temporary gaps in health insurance." (Doc. 124 ¶ 17; Doc. 124-1 at 17). Mrs. Cawley also agreed that the Declaration and Understanding contained in the insurance application, as well as the first page of each Certificate of Insurance, featured a disclaimer in large, bold font that stated,

> This coverage is not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act. Be sure to check your Policy/Certificate carefully to make sure you are aware of any exclusions or limitations regarding coverage of preexisting

conditions or health benefits (such as hospitalization, emergency services, maternity care, preventive care, prescription drugs, and mental health and substance use disorder services). Your Policy/Certificate might also have lifetime and/or annual dollar limits on health benefits.

(Doc. 124 ¶¶ 18–19; Doc. 124-1 at 16, 24; Doc. 124-4 at 34). Plaintiffs' purchasing of the plan also included a 10-day "free look" period, meaning that they "had 10 days to take a 'free look' at the plan and would receive a full refund if [they] decided to cancel." (Doc. 124 ¶ 12).

In January 2020, the Cawleys reinstated their insurance coverage after a brief lapse. (*Id.* ¶ 22). Mrs. Cawley spoke with another agent of GoHealth, Richard Bowen ("Bowen"), during the reinstatement process. (*Id.*; Doc. 124-1 at 55). Bowen reiterated that the coverage was "not required to comply with certain federal market requirements for health insurance, principally those contained in the Affordable Care Act, which means it doesn't meet the minimum essential requirements . . . because we do have exclusions and limitations regarding preexisting conditions." (Doc. 124 ¶ 24; Doc. 124-1 at 57). Mrs. Cawley responded, "Right. We were aware of that from the last round." (Doc. 124-1 at 57).

In February 2020, Mr. Cawley was diagnosed with Stage 4 prostate cancer. (Doc. 124 ¶ 25). He underwent a series of hospitalizations and provider visits throughout 2020. (*Id.* ¶¶ 25–48). While American Financial contends that it paid the full amount of benefits owed to the Cawleys, the Cawleys maintain that American Financial still owes $148,522.69 on these medical bills, which amounts to "80% of the total amounts billed by all providers and subtracting what American Financial already paid." (*Id.* ¶ 49). American Financial used a third-party administrator, International Benefits Administrators, LLC ("IBA") to perform claims handling on its behalf. (*Id.* ¶ 53). IBA processes claims according to the terms of the plan certificate. (*Id.* ¶ 54).

On February 16, 2021, the Cawleys submitted a letter to the Arizona Department of Insurance & Financial Institutions ("DOI") complaining that bills from his hospital stays had not been paid. (*Id.* ¶ 50; Doc. 124-1 at 62). However, on October 27, 2021, a DOI supervisor informed Mr. Cawley that, upon review, it appeared that the maximum coverage

4

amounts had been paid. (Doc. 124 ¶ 51; Doc. 124-1 at 105–08). The Cawleys initiated this action in Maricopa County Superior Court on January 12, 2022, naming as defendants American Financial, IBA, and Vaval and her husband. (Doc. 1 at 1–2). They asserted six counts under Arizona law: (1) breach of contract against American Financial, (2) breach of the implied covenant of good faith and fair dealing ("bad faith") against American Financial, (3) aiding and abetting against IBA, (4) intentional interference with contract against IBA,[3] (5) consumer fraud against American Financial and Vaval, and (6) "agent negligence" against American Financial and Vaval. (*Id.* at 2; Doc. 1-4 at 5–9). On May 12, 2022, American Financial removed the action to this Court. (Doc. 1 at 1). Vaval's husband, "J. Doe Vaval," was voluntarily dismissed by the Cawleys on June 15, 2022. (Doc. 15). Because Vaval herself never appeared in the action, default was entered against her on August 1, 2022. (Doc. 21). After an extended discovery period (*see* Docs. 36, 72, 102 (all granting motions to extend)), on September 4, 2024, American Financial and IBA each filed their Motions for Summary Judgment (Docs. 121, 123), which are now fully briefed and ripe for ruling.

## II.    LEGAL STANDARD

This case was removed to federal court on the basis of diversity jurisdiction, so the Court must apply the substantive law of Arizona. *E.g.*, *Am. Triticale, Inc. v. Nytco Servs., Inc.*, 664 F.2d 1136, 1141 (9th Cir. 1981) ("It is well settled that a federal court exercising diversity jurisdiction must apply substantive state law."). However, federal law will govern procedural questions, including the summary judgment standard. S*ee Martinez v. Asarco Inc.*, 918 F.2d 1467, 1470 n.3 (9th Cir. 1990).

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*,

---

[3] The parties stipulated to dismissal of this count on September 27, 2024. (Docs. 129, 130).

477 U.S. 317, 323 (1986). The moving party can satisfy its burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See id.* at 322–23. When considering a motion for summary judgment, a court must view the factual record and draw all reasonable inferences in a light most favorably to the nonmoving party. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).

## III.    DISCUSSION

### A. American Financial's Motion for Summary Judgment

There are four counts brought by Plaintiffs against American Financial, and American Financial seeks summary judgment as to each claim: (1) breach of contract, (2) breach of the covenant of good faith and fair dealing ("bad faith"), (3) consumer fraud in violation of A.R.S. § 44-1521 *et seq.*, and (4) "agent negligence." The Court will now address each of these counts in turn.

#### a.  *Breach of Contract Claim*

In their Complaint, Plaintiffs contend that American Financial "breached the [insurance policy issued to Plaintiffs] by failing to pay the benefits to which Plaintiffs were entitled under the Policy, or that the Cawleys reasonably expected to be paid under the Policy." (Doc. 1-4 at 5). American Financial argues that there was no breach because (1) American Financial has fully paid all benefits owed to the Cawleys (Doc. 123 at 7–10), and (2) "[t]o the extent the Cawleys argue that they expected to receive greater benefits . . . there is no rational basis for such expectations . . . ." (*Id.* at 10). Plaintiffs do not dispute that all benefits under the policy as written were paid out to them; however, they argue that activity reasonably attributable to American Financial induced them to believe they had greater coverage than the plain language of the policy would suggest. (Doc. 140 at 8).

Under the doctrine of reasonable expectations, "Arizona courts will not enforce even unambiguous boilerplate terms in standardized insurance contracts in a limited variety of situations"; namely, (1) "[w]here the contract terms, although not ambiguous to the court, cannot be understood by the reasonably intelligent consumer who might check on

6

his or her rights," (2) "[w]here the insured did not receive full and adequate notice of the term in question, and the provision is either unusual or unexpected," (3) "[w]here some activity which can be reasonably attributed to the insurer would create an objective impression of coverage in the mind of a reasonable insured," or (4) "[w]here some activity reasonably attributable to the insurer has induced a particular insured reasonably to believe that he has coverage, although such coverage is expressly and unambiguously denied by the policy." *Gordinier v. Aetna Cas. & Sur. Co.*, 154 Ariz. 266, 272–73 (1987). Plaintiffs argue that in the instant case, a reasonable jury could find that the third and fourth *Gordinier* scenarios apply. (Doc. 140 at 9). While the reasonable expectations doctrine *cannot* be invoked "to add language to a policy to grant coverage not otherwise provided for," it *can* be used to "negate definitions, conditions, and exclusions that take away coverage from a policy that otherwise provides such coverage." *Gregorio v. GEICO Gen. Ins. Co.*, 815 F. Supp. 2d 1097, 1105–06 (D. Ariz. 2011), *aff'd*, 535 F. App'x 545 (9th Cir. 2013). However, for a Court to strike an exclusionary term, "the insurance company must have had reason to believe that the insured would not have agreed to the policy if he or she knew of the term." *Date St. Cap., LLC v. Progressive Preferred Ins. Co.*, 2024 WL 81503, at *4 (Ariz. Ct. App. Jan. 8, 2024).

It is clear that the Cawleys would not have purchased this insurance policy had they fully understood its terms and limitations. (Doc. 142-3 ¶ 39); *see also Haisch v. Allstate Ins. Co.*, 5 P.3d 940, 945 (Ariz. Ct. App. 2000) ("Consumers do not purchase insurance coverage for commercial advantage. They do so to obtain protection from calamity."). But it is less clear whether the Cawleys' expectations regarding the policy were reasonable and whether American Financial can be held liable for those expectations. Because Mrs. Cawley did not read the policy, her expectations were based on (1) Vaval's affirmative statements that the "coverage maximum per person is $1 million" with a $10,000 deductible, and that the benefits of the plan included preventative and wellness care, "inpatient prescription drugs, physical, occupational and speech therapists, emergency transportation, inpatient room and board, home health care, extended care," as well as (2)

Vaval's omission of any mention of the per-day and per-event caps on said coverage. (Doc. 124-1 at 34; Doc. 140 at 5–7).[4] Based on these statements, she believed the STMP would provide "up to a million dollars of coverage for catastrophic illness or accident." (Doc. 142-3 ¶ 31).

### 1. Reasonable Belief of the Insured

The first question is whether it was reasonable for Plaintiffs to believe their policy would provide up to a million dollars of coverage under the circumstances. American Financial argues that Mrs. Cawley's awareness of the significant price difference between short-term medical coverage and major medical coverage, especially given Mrs. Cawley's relative sophistication and prior employment as a paralegal, shows that it was not reasonable for Plaintiffs to believe the policy would provide a million dollars of coverage in case of catastrophic illness or accident. (Doc. 159 at 6; Doc. 124 ¶¶ 1–2). This Court is inclined to agree with American Financial that it was likely unreasonable for Plaintiffs to have believed their policy offered full coverage, even if limited to coverage for "catastrophic illness or accident." (Doc. 142-3 ¶ 31; Doc. 159 at 6); *see Diaz v. Health Plan Intermediaries Holdings LLC*, 2021 WL 4844321, at *8 (D. Ariz. June 7, 2021). However, Mrs. Cawley explained that her expectations were influenced by the policy's high deductible, as well as her understanding that she would not receive any coverage for maternity care, preventative care, dental or vision, and any pre-existing conditions. (Doc. 142-3 ¶¶ 30–31). Ultimately, whether the average, reasonably informed policyholder would expect up to a million dollars of coverage for catastrophic illness or accident under these circumstances is a debatable question, and it is therefore a question for the finder of fact to determine at trial. *See Averett v. Farmers Ins. Co. of Arizona*, 869 P.2d 505, 508 (Ariz. 1994); *Servs. Holding Co. v. Transamerica Occidental Life Ins. Co.*, 883 P.2d 435,

---

[4] American Financial argues that Vaval's statements are irrelevant to the policy at issue, which was signed in January 2020. (Doc. 159 at 4; Doc. 124 ¶ 22). However, Vaval's statements, if reasonably attributable to AFS, informed Plaintiffs' expectations of the policy they were receiving in 2020, since they asked for the same policy they initially purchased in 2018. (Doc. 141 ¶ 80; Doc. 142-3 ¶ 51).

441 (Ariz. Ct. App. 1994) ("At best, the insureds' previous experience and its effect on their expectations are factual questions.").

### 2.  *Activity Reasonably Attributable to the Insurer*

Next, the Court must determine whether Vaval's statements (and/or omissions) can be reasonably attributable to American Financial, which requires analysis of the agency relationship between Vaval and American Financial. The question of whether an agency relationship existed is one of fact, but "when the material facts from which the agency relationship could be inferred are not in dispute, the question of whether an agency relationship exists is a question of law for the court." *Sparks v. Republic Nat. Life Ins. Co.*, 647 P.2d 1127, 1140 (Ariz. 1982).

"Insurance agents differ from independent agents or brokers. The former are authorized representatives of the insurer; the latter are middlemen representing the insured. For this reason, the acts of the insurance agent, but not those of the independent agent or broker, are imputable to the insurer." *Curran v. Indus. Comm'n*, 752 P.2d 523, 525 (Ariz. Ct. App. 1988). The distinction between an insurance agent and an independent agent depends on "the particular facts of the case." *Id.* at 526. "Where the insurer's actions create actual or apparent authority for a broker to act on its behalf, the broker becomes the agent of the insurer." *Id.*

There are two types of agency, express and apparent. *Id.* "If there is evidence that the principal has delegated authority by oral or written words which authorize him to do a certain act or series of acts, then the authority of the agent is express. If there is no such express authority, or if intent to create such authority cannot be implied from the actions of the principal and agent, then the next question is whether there is apparent agency." *Gulf Ins. Co. v. Grisham*, 613 P.2d 283, 286 (Ariz. 1980). "Apparent agency exists when 'the principal has intentionally or inadvertently induced third persons to believe that such a person was its agent although no actual or express authority was conferred on him as agent.'" *Premium Cigars Int'l, Ltd. v. Farmer-Butler-Leavitt Ins. Agency*, 96 P.3d 555, 565 (Ariz. Ct. App. 2004) (citations omitted).

American Financial asserts, as a legal conclusion, that "[n]either GoHealth, Ms. Vaval, nor Mr. Bowen was an agent of or had the power to bind American Financial." (Doc. 124 ¶ 11). In a declaration from American Financial's Director of Compliance, Jacob A. Armpriester ("Armpriester"), he states that American Financial "has no relationship, contractual or otherwise," with GoHealth, Vaval, or Bowen, "other than appointing them to sell American Financial insurance products." (Doc. 124-2 ¶ 14). However, Plaintiffs point out that "Vaval signed the Application stating she was American Financial's agent," and that Mrs. Cawley "understood [Vaval] to be speaking on behalf of the insurance company whose policy she was selling." (Doc. 141 ¶ 11). Indeed, the November 28, 2018 insurance application signed by Mrs. Cawley lists "Sharisa Vaval" as "American Financial Life Insurance Company Agent." (Doc. 124-3 at 6). Beyond Plaintiffs' assertions that Vaval and Bowen were both "appointed and authorized by [American Financial] to sell its products," the exact nature of the relationship between American Financial and GoHealth is murky. (Doc. 140 at 10). No contracts describing the scope of the relationship between American Financial and GoHealth were disclosed,[5] so it is unclear how they were "appointed" to sell American Financial products. (Doc. 124-2 ¶ 14). Plaintiffs argue that American Financial "bestowed authority on Vaval" to sell its products and held her out as their agent by drafting the insurance application, and that therefore, "whether Vaval was [American Financial's] agent is a matter of disputed fact." (Doc. 140 at 10).

During his Rule 30(b)(6) deposition, Armpriester testified that American Financial had either written or verbal agreements with numerous "selling platforms" consisting of multiple licensed agents, and that American Financial "expect[ed] the agent[s] to provide accurate description[s] of the policy and the terms and the conditions and the limitations therein." (Doc. 142-1 at 30–32). Armpriester stated that American Financial "does not provide training to specific agents," but rather "for the selling platforms, and the

---

[5] In fact, in response to a subpoena sent by Plaintiffs, General Counsel for GoHealth stated that they "were unable to identify relevant contracts with American Financial . . . ." (Doc. 124-1 at 48).

contractual relationships require the selling platforms to accurately represent the product to it [sic] sales staff for sale to the public." (*Id.* at 37). However, the nature of that "contractual relationship" is unclear given Armpriester's contrary assertion that American Financial "has no relationship, contractual or otherwise," with GoHealth, Vaval, or Bowen. (Doc. 124-2 ¶ 14).

A broker does not become an agent of the insurer "simply because the insurer contemplates receiving insurance business from brokers." *Curran*, 752 P.2d at 527. There must be additional facts to support the creation of an agency relationship. Here, Armpriester provided little information about the nature of any training, supervision, or continuing education American Financial may or may not have provided to these selling platforms or agents. *See id.* at 526. It does not appear that American Financial expressly delegated any authority to Vaval beyond the authority to sell their insurance policies and to "accurately represent" those policies to prospective buyers. (Doc. 142-1 at 30).[6] However, there are outstanding factual questions regarding whether American Financial may have "inadvertently induced third persons to believe that such a person was its agent although no actual or express authority was conferred on him as agent." *Premium Cigars*, 96 P.3d at 565 (citations omitted). This is especially true given Vaval's signature as "agent" on the insurance application,[7] and because Vaval has not appeared in this litigation, further

_____

[6] In fact, a single sentence within the insurance application specifically required Mrs. Cawley to acknowledge that "[n]o representation by an agent or any other person shall be binding on . . . the insurance carrier." (Doc. 124-3 at 25). However, as Plaintiffs note, that single condition buried within the documents does not preclude application of the reasonable expectations doctrine. (Doc. 140 at 12).

[7] American Financial argues that "[t]here are not facts suggesting that Mrs. Cawley saw this signature block *before* making the decision to purchase the STMP, nor is there any indication that Mrs. Cawley relied upon this signature block in making that decision." (Doc. 159 at 10). However, as American Financial is quick to emphasize (*see id.* at 4 ("Even assuming statements made by Ms. Vaval . . . are somhow relevant to the STMP purchased in 2020 (they are not), Plaintiffs do not claim that she misrepresented the STMP or misled Mrs. Cawley as to its terms.")), the relevant policy at issue is the one Plaintiffs purchased in January 2020, *after* Vaval signed the initial 2018 policy as American Financial's "agent." It is therefore plausible that the Cawleys could have continuously relied on Vaval's statements and omissions regarding the 2018 and could have believed her to be American Financial's agent when they made the decision to renew the policy in 2020.

facts regarding the nature of the relationship between American Financial, GoHealth, and GoHealth agents need to be elicited before this Court can declare, as a matter of law, that an agency relationship existed.

Accordingly, there is a sufficient dispute of material fact regarding whether activity reasonably attributable to American Financial led to Plaintiffs' beliefs about the insurance.

### 3.  Reason to Believe the Insured Would Not Have Agreed

Finally, to invoke the reasonable expectations doctrine under these circumstances, the Court must find that American Financial had reason to believe the Cawleys would not have agreed to the policy if they knew of the per-day and per-event caps on coverage. *State Farm Fire & Cas. In. Co. v. Grabowski*, 150 P.3d 275, 280 (Ariz. Ct. App. 2007), *as amended* (Jan. 29, 2007). An insurer's reason to believe the insured would not have agreed to the policy "may be (1) shown by the parties' prior negotiations, (2) inferred from the circumstances of the transaction, (3) inferred from the fact that the term is bizarre or oppressive, (4) inferred from the fact that the term eviscerates the non-standard terms to which the parties explicitly agreed, or (5) inferred if the term eliminates the dominant purpose of the transaction." *Id.* "An inference that the drafter knew the signing party would not have agreed to the term may be reinforced if the signing party never had an opportunity to read the term or if it is illegible or otherwise hidden from view." *Id.*

American Financial argues that Plaintiffs "cannot show that American Financial 'had reason to believe that [the Cawleys] would not have accepted the agreement if [they] had known that the agreement contained the particular term," (Doc. 123 at 13), and that "the Cawleys have no evidence that American Financial had knowledge of *any* expectations beyond the plain terms of the STMP." (*Id.* at 14). However, American Financial's focus on the Cawleys' purported lack of evidence ignores the plain language of the *State Farm* case, which specifically contemplates that the insurer's reason to believe the insured would not have agreed can be *inferred* from the circumstances of the transaction or terms of the policy. Here, Plaintiffs have clearly argued that the per-day, per-event caps on coverage were "oppressive." For example, they argue that "[i]t's common sense that

consumers purchase health insurance to avoid financial ruin if diagnosed with a serious illness or seriously injured. Mrs. Cawley specifically asked if the Policy covered hospitalization." (Doc. 140 at 9). To that end, a reasonable jury could find that the per-day caps on hospital coverage were an "oppressive" term hidden within the policy, and a reasonable jury could also find that the per-day caps eliminate the dominate purpose of the transaction, given that many consumers purchase health insurance to guard against financial ruin in case of catastrophe. *See Diaz*, 2021 WL 4844321, at *7 ("[A] reasonable jury could find from the nature of the warnings on both the enrollment forms and policy documents that [the insurer] had reason to believe that others would not assent to the limitations in the policy if they knew the limitations were there. [The insurer] would have no reason to warn applicants so purposefully of the limited nature of the policy if such limitations were standard for health-insurance policies.") (citation omitted).

Ultimately, drawing all reasonable inferences in a light most favorable to Plaintiffs, there are disputed issues of material fact regarding whether Plaintiffs may invoke the doctrine of reasonable expectations. Because a reasonable jury could find that the prerequisites to invoking the doctrine have been met, American Financial is not entitled to summary judgment as to Plaintiffs' breach of contract claim.

### b.  *Bad Faith Claim*

"[A]n insurance contract provides more than just security from financial loss to the insured." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 280 (Ariz. 2000). "[T]he insured also is entitled to receive the additional security of knowing that she will be dealt with fairly and in good faith. That security comes not from the express contractual terms, but from the implied covenant of good faith and fair dealing." *Deese v. State Farm Mut. Auto. Ins. Co.*, 838 P.2d 1265, 1269 (Ariz. 1992).

Under Arizona law, the tort of bad faith arises when an insurer "intentionally denies, fails to process or [fails to] pay a claim without a reasonable basis for such action." *Noble v. Nat'l Am. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981). "To show bad faith by the insurer, the insured must show (1) that the insurer acted unreasonably toward the insured,

and (2) that the insurer 'acted knowing that it was acting unreasonably or acted with such reckless disregard that such knowledge may be imputed to it.'" *Alvarez v. CSAA Gen. Ins. Co.*, 2025 WL 389140, at *7 (D. Ariz. Feb. 4, 2025) (quoting *Trus Joist Corp. v. Safeco Ins.*, 735 P.2d 125, 134 (Ariz. Ct. App. 1986)). The first prong is an objective inquiry into the reasonableness of the insurer's actions under the circumstances of the case. *See Sparks*, 647 P.2d at 1136. "Whether the action amounts to bad faith depends upon whether the insurer failed to honor a claim without a reasonable basis for doing so." *Id.*; *see also Harvey Prop. Mgmt. Co., Inc. v. Travelers Indem. Co.*, 2016 WL 8200625, at *3 (D. Ariz. May 12, 2016) ("An insurer may challenge a claim it believes is 'fairly debatable' without acting in bad faith, but only if the insurer acts reasonably in investigating, evaluating, and processing the claim."). Under the second, subjective prong, "the Court asks whether the insurer acted knowingly or with reckless disregard as to the reasonableness of its actions." *Christie's Cabaret of Glendale LLC v. United Nat'l Ins. Co.*, 562 F. Supp. 3d 106, 121 (D. Ariz. 2021).

"It has consistently been held that an insurer can be held liable for bad faith even when it does not violate any express provision of the insurance contract." *Lloyd v. State Farm Mut. Auto. Ins. Co.*, 943 P.2d 729, 737 (Ariz. Ct. App. 1996). "The implied covenant [of good faith and fair dealing] is breached, whether the carrier pays the claim or not, when its conduct damages the very protection or security which the insured sought to gain by buying insurance." *Rawlings v. Apodaca*, 151 Ariz. 149, 157 (1986). "An insurer is not required to prevent all harm to the insured, but must act honestly, on adequate information, and not place paramount importance on its own interests," and the insurer "violates the implied covenant when it does 'anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement.'" *Tavilla v. Blue Cross & Blue Shield of Arizona, Inc.*, 2014 WL 4473638, at *5 (Ariz. Ct. App. Sept. 11, 2014) (quoting *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 28 (2002)).

Here, although American Financial does not dispute that it would be vicariously

14

liable for IBA acting in bad faith (*see* Doc. 123 at 14–15; Doc. 159 at 11), it argues that Plaintiffs' bad faith claim must fail as a matter of law because it "paid all benefits in accordance with the terms of the Policy, and, therefore, did not breach the terms of the STMP . . . ." (Doc. 123 at 14). Furthermore, it notes that it "even paid benefits despite Mr. Cawley's cancer diagnosis occurring within the 30-day waiting period." (*Id.* at 15).[8] By contrast, Plaintiffs argue that American Financial is vicariously liable for IBA's bad faith actions, including its delay in paying claims "using pretext of not having medical records . . ., denying or reducing benefits for alleged preexisting condition and failure to preauthorize services but then subsequently paying, no- and slow responses, mixed and misleading responses, being put on hold for horrendous amounts of time, hang ups of telephone calls, ignored calls, and failing to advocate for coverage that the Cawleys thought they were getting, and inconsistent statements about how their deductible worked." (Doc. 140 at 13). Furthermore, it argues that American Financial's bad faith is demonstrated by "how it insulated itself entirely from the conduct of its claims processor, cutting itself off from query by an insured." (*Id.* at 15).

Plaintiffs have set forth evidence that IBA acted unreasonably by delaying claims processing based on the pretext that they had not received medical records that had already been sent several times (Doc. 142-2 at 31); denying claims on the basis that Mr. Cawley's cancer diagnosis was "preexisting" when it was ultimately determined not to be a preexisting condition (*Id.* at 35); not answering calls, being placed on hold and ultimately hung up on, and not being able to speak to supervisors (*Id.* at 41); and being falsely assured that if they paid the remaining $7,700 out of their $10,000 deductible amount, American Financial would pay 80% of the remaining bill (*Id.*). American Financial argues that Plaintiffs cannot show that IBA's delay in payment was objectively unreasonable because "[t]he uncontroverted evidence shows that IBA's delay was caused by the COVID

---

[8] American Financial contends that it "could have denied the [February 2020 hospital] claim altogether under the 'Waiting Period for Illness' provision" of the policy, which only provides coverage for cancer that begins more than 30 days following the date of the policy's inception. (Doc. 124 ¶ 29).

pandemic." (Doc. 159 at 12). However, Plaintiffs note that "[s]ome claims were paid by June of 2020[,] which was during the time that IBA said things were delayed due to the Pandemic, and yet other claims were not fully paid until September of 2021, long after IBA allegedly got fully back up to speed . . . ." (Doc. 140 at 14). It is therefore a disputed issue of material fact whether IBA's delays were reasonable because they may have been caused by the COVID pandemic.

One-off oversights or slight delays would not constitute bad faith. *See, e.g.*, *Tang v. Shell Chem. Co.*, 317 F. App'x 660, 661 (9th Cir. 2009) (noting that "the failure to return a single voicemail message does not constitute objectively unreasonable behavior sufficient to establish bad faith."). However, Mrs. Cawley's testimony suggests a consistent pattern of such behavior, which creates a disputed issue of material fact as to whether IBA did "anything to prevent [Plaintiffs] from receiving the benefits and entitlements of the agreement." *Tavilla*, 2014 WL 4473638, at *5. Accordingly, the Court will deny summary judgment as to the bad faith claim.

### c. Consumer Fraud Claim

Plaintiffs assert a consumer fraud claim under Arizona Revised Statute § 44-1521 *et seq.* against American Financial for vicarious liability for Vaval's representations regarding the insurance policy at issue. (Doc. 1-1 ¶¶ 42–47). The statute forbids the "act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby . . . ." Ariz. Rev. Stat. Ann. § 44-1522 (2013).

### 1. Statute of Limitations

A consumer fraud claim under A.R.S. § 44-1522 "will begin accruing at the moment a plaintiff discovers—or should be able to discover—the underlying fraud." *Garner v. Medicis Pharm. Corp.*, 2023 U.S. Dist. LEXIS 172528, at *8 (D. Ariz. Sep. 27, 2023).

"'Ordinarily, when the cause of action accrues is a question for the finder of fact,' with summary judgment appropriate where only one reasonable inference can be drawn." *Id.* (quoting *Alaface v. Nat'l Inv. Co.*, 892 P.2d 1375, 1380 (Ariz. Ct. App. 1994)).

American Financial argues that Plaintiffs' consumer fraud action accrued "by no later than July 22, 2020, when American Financial . . . notified Mr. Cawley that $45,504.91 of his bills were not covered by the Policy." (Doc. 159 at 10; Doc. 124-5 at 12). They argue that this put Plaintiffs on notice that "they were personally liable for uncovered medical expenses that exceeded what they allegedly expected the STMP to pay." (*Id.*). However, Plaintiffs contend that "[a] reasonable jury could find that the Cawleys' consumer fraud claim arose no earlier than January 12, 2021, because prior to January 12, 2021, there had been no final determination by Defendants as to the payment of the Cawleys' medical bills and therefore, the Cawleys had not yet been damaged." (Doc. 140 at 15). They argue that the "lack of response (and follow up) to the Cawley's [sic] innumerable calls to IBA left the Cawleys ignorant about how much would be paid." (*Id.*).

The Court agrees with Plaintiffs that when the consumer fraud cause of action accrued in this case would be a question for the finder of fact. It is reasonable to infer that the Cawleys would be confused and uncertain as to the extent of their ultimate liability until a final determination on their claims was made, particularly where, as they have alleged, they received competing information while on the phone with IBA agents, and otherwise had their calls ignored, delayed, or hung up on in the months following their first major bill notification. Thus, the one-year statute of limitations does not bar Plaintiffs' consumer fraud claim.

### 2.  Agent Liability

Next, American Financial argues that Plaintiffs have no evidence of an agency relationship between American Financial and Vaval, and that American Financial "also did not consent for Ms. Vaval to do anything other than sell its products." (Doc. 123 at 15). However, this Court has already discussed that there are disputed issues of material fact regarding whether Vaval was acting with apparent authority as American Financial's agent,

even if she lacked express authority to make the representations she did. Additionally, American Financial's argument that Vaval "made no false or misleading representations to the Cawleys" ignores that A.R.S. § 44-1522 specifically contemplates consumer fraud liability based on a party's *omissions*, not just affirmative statements. (Doc. 123 at 17).

However, American Financial's further argument is availing, as they point out that Ms. Vaval "was not involved in the sale of the January 2020 STMP at issue in this lawsuit." (*Id.*). While that argument was not relevant to Plaintiffs' claim for breach of contract, it is relevant here.[9] "To establish a claim under Arizona's consumer fraud statute, A.R.S. § 44-1522, the plaintiff 'must show a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and consequent and proximate injury resulting from the promise.'" *Diaz*, 2021 WL 4844321, at *5 (quoting *Kuehn v. Stanley*, 91 P.3d 346, 351 (Ariz. Ct. App. 2004)). Here, Plaintiffs' alleged injuries were caused by the denial of their medical claims under the 2020 policy, not any denial of claims under the (functionally identical) 2018 policy. Any statements, misrepresentations, or omissions may have Vaval made regarding the 2018 policy are, as a matter of law, irrelevant to the 2020 policy. Accordingly, summary judgment is granted in American Financial's favor as to the consumer fraud claim.

### d. Agent Negligence Claim

For the same reason summary judgment must be granted as to the consumer fraud claim against American Financial, it must also be granted as to the agent negligence claim. Plaintiffs have failed to establish, as a matter of law, how Vaval's alleged negligence in 2018 relates to the injuries that occurred as a result of the later 2020 policy. Plaintiffs have not pointed to any case law that would suggest anything like a doctrine of reasonable expectations that can connect Plaintiffs' understanding of the 2018 policy to the 2020

---

[9] This Court has already noted that Vaval's statements, if reasonably attributable to AFS through an apparent agency relationship, may have informed Plaintiffs' expectations of the policy they were receiving in January 2020, since they asked for the same policy as the one that they had initially purchased in 2018. However, the reasonable expectations doctrine is irrelevant to Plaintiffs' consumer fraud claims.

1    policy, and they therefore have not proximately connected the injuries caused by the 2020

2    policy to Vaval's alleged negligence in 2018.

3    **B. IBA's Motion for Summary Judgment**

4    Because one of Plaintiffs' two claims against Defendant International Benefit

5    Administrators was already dismissed by the parties' stipulation (Docs. 129, 130), the only

6    claim on which IBA now moves for summary judgment is Count III of the Complaint for

7    aiding and abetting tortious conduct. (Doc. 1-4 ¶¶ 32–36).

8    *a. Aiding and Abetting Claim*

9    In conjunction with their bad faith claim against American Financial, Plaintiffs also

10   assert that IBA "substantially assisted American Financial's bad faith by, *inter alia*,

11   delaying and preventing communications with the Cawleys regarding questions and issues

12   in their claims and improperly denying claims and providing false and/or conflicting

13   reasons for the nonpayment of Gary Cawley's claims." (Doc. 1-4 ¶ 35). In their Motion for

14   Summary Judgment (Doc. 121), IBA contends that (1) the Cawleys' bad faith claim against

15   American Financial, the primary tortfeasor, must fail, so the claim against IBA must also

16   fail; and (2) even if the Cawleys could prove that American Financial acted in bad faith,

17   because Plaintiffs' aiding and abetting claim against IBA is based on the same conduct as

18   the bad faith claim against American Financial, the aiding and abetting claim must fail.

19   (Doc. 121 at 6).

20   Under Arizona law, an aiding and abetting claim requires proof of three elements:

21   "(1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the

22   defendant must know that the primary tortfeasor's conduct constitutes a breach of duty;

23   and (3) the defendant must substantially assist or encourage the primary tortfeasor in the

24   achievement of the breach." *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement*

25   *Masons Loc. No. 395 Pension Tr. Fund*, 38 P.3d 12, 23 (2002), *as corrected* (Apr. 9, 2002)

26   (citations omitted). However, "in the insurance bad-faith context, federal courts in this

27   district add another legal principle that does not appear in the state-court caselaw," a so-

28   called "fourth element." *Kubli v. AmTrust Ins. Co. of Kansas*, 2019 WL 13196105, at *2

(D. Ariz. Oct. 30, 2019). "To state a claim against an adjuster for aiding and abetting the insurer's bad faith, the plaintiff 'must allege some action taken by [the adjuster] separate and apart from the facts giving rise to the [bad-faith] claim against' the insurer." *Id.* (quoting *Centeno v. Am. Liberty Ins. Co.*, 2019 WL 568926, at *3 (D. Ariz. Feb. 12, 2019)).

The Court recognizes that courts in this District have disagreed as to the necessity of this "fourth element," sometimes called the "separate action" rule. *See Aguado v. XL Ins. Am.*, 721 F. Supp. 3d 811, 815–16 (D. Ariz. 2024) ("Although courts in this District often have held that Arizona law would permit a claim against an adjuster or a third-party administrator for aiding and abetting the insurer's bad faith conduct, no conclusive case law exists. Thus, whether Arizona law would recognize such a tort remains unclear.") (collecting cases); *see also Watkins v. Praetorian Ins. Co.*, 2021 WL 12300188, at *5 (S.D. Tex. Feb. 9, 2021) ("Arizona law is ambiguous on the question of whether a claim can be brought against an individual adjuster for aiding and abetting an insurer's breach of the duty of good faith."). However, this Court is persuaded by the reasoning in *Kubli*, which explains how the "separate action" rule is "consistent with the Restatement (Second) of Torts, on which Arizona models its claim of aiding and abetting." *Kubli*, 2019 WL 13196105, at *3.

Here, because the aiding and abetting claim against IBA is predicated on the same conduct giving rise to Plaintiffs' bad faith claim against American Financial, it must fail as a matter of law. *See Aguado*, 721 F. Supp. 3d at 817. Summary judgment is therefore appropriately granted in favor of Defendant IBA.

## IV.    **CONCLUSION**

In sum, the Court finds that there are disputed issues of material fact as to Plaintiffs' claims for breach of contract (Count I) and bad faith (Count III) against Defendant American Financial. Accordingly, only those two claims survive summary judgment, with the remaining counts against American Financial and the single count against IBA to be dismissed.

///

1

**IT IS THEREFORE ORDERED** that Defendant American Financial Security Life Insurance Company's Motion for Summary Judgment (Doc. 123) is **granted in part and denied in part**. The Motion is **denied** with respect to Plaintiffs' claims for breach of contract (Count I) and bad faith (Count II) against Defendant American Financial. The Motion is **granted** with respect to Plaintiffs' claims for consumer fraud (Count V) and agent negligence (Count VI).

**IT IS FURTHER ORDERED** that Defendant International Benefit Administrators' Motion for Summary Judgment (Doc. 121) is **granted**, and that Defendant International Benefit Administrators is **dismissed** as a party.

Dated this 26th day of February, 2025.

Honorable Steven P. Logan
United States District Judge